United States District Court
Southern District of Texas
**ENTERED**

May 18, 2020

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HUI YE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:18-cv-4729 |
| | § | |
| XIANG ZHANG, *et al*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After a seven-day bench trial, Defendant moved for Judgment on Partial Findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. After considering the record evidence, parties' arguments, and trial testimony and evidence, the Court determines that it must **GRANT** Defendant's motion. The Court submits the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.[1]

## I.    BACKGROUND

This is a dispute between two businessmen who jointly own six companies in the logistics and water filter industries. Plaintiff Hui Ye originally filed this suit against Defendant Xiang Zhang and Defendant's wife, Wing Lau (collectively, "Defendants"), asserting claims for promissory estoppel, fraudulent inducement and fraudulent misrepresentation, breach of fiduciary duty individually and derivatively, constructive trust, declaratory judgment, fraudulent concealment, conversion, and violation of the Texas Theft Liability Act (the "TTLA"). (Doc. No. 6). Defendants counterclaimed, asserting claims against Ye for unjust enrichment, promissory estoppel, tortious

---

[1]To the extent any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law; and to the extent any Conclusion of Law reflects a factual finding, it shall to that extent be deemed a Finding of Fact.

interference with existing contract, tortious interference with prospective relations, conversion, intentional infliction of emotional distress, malicious civil prosecution, fraudulent misrepresentation, and breach of fiduciary duty. (Doc. No. 36, 37). Defendants subsequently moved for summary judgment against Ye's claims.

At a hearing on November 4, 2019, the Court dismissed all claims against Lau. (Minute Entry, 11/4/2019). The Court granted in part and denied in part Zhang's Motion for Partial Summary Judgment. The Court dismissed as to Ye's claims for fraudulent concealment and conversion, but denied the motion as to Ye's claims against Zhang for promissory estoppel, fraudulent inducement and fraudulent misrepresentation, breach of fiduciary duty, and civil theft under the TTLA. (Minute Entry, 11/4/2019).

On December 9, 2019, these issues came for trial before the Court. At trial, Zhang and Ye testified. Ye also called as witnesses the auditor Katie Hou; two friends who were involved with the water filter operations, Xiangdong Ren and Bin Gao; and the realtor Toby Chen. After the close of Plaintiff's case-in-chief on December 18, 2019, Defendant orally moved for judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure. After the Court heard argument from both parties regarding the sufficiency of the evidence as to Plaintiff's claims for promissory estoppel, fraudulent inducement, civil theft under the TTLA, and breach of fiduciary duty, the Court took the motion under advisement.

The parties subsequently filed post-trial briefing in support of and opposition to the Defendant's motion. After considering the parties' briefing and arguments, the evidence of record, and applicable law, the Court determines that Defendant's motion must be granted.

## II.   <u>LEGAL STANDARD</u>

Rule 52(c) of the Federal Rules of Civil Procedure provides that a court may enter judgment after a party has been "fully heard" on an issue during a nonjury trial. Fed. R. Civ. P. 52(c). A judgment on partial findings is appropriate when a claim or defense of the nonmoving party "can be maintained or defeated only with a favorable finding on that issue." *Id.* In considering a motion for judgment on partial findings, the court "is not required to draw any inferences in favor of the non-moving party." *Miles-Hickman v. David Powers Home, Inc.*, 613 F. Supp. 2d 872, 880 (S.D. Tex. 2009) (citing *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006)); 9 Moore's Federal Practice – Civil § 52.51 (2020). Instead, the court must "evaluate and weigh all the evidence, make determinations regarding credibility, and resolve the case on the basis of the preponderance of the evidence." 9 Moore's Federal Practice – Civil § 52.51 (2020).

A court entering judgment pursuant to Rule 52(c) must satisfy the requirements of Rule 52(a)(1) by "find[ing] the facts specially and stat[ing] its conclusions of law separately." Fed. R. Civ. P. 52(c); *see Miles-Hickman*, 613 F. Supp. 2d at 880. In articulating findings of fact, Rule 52(a) "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Cent. Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (quoting *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir. 1996)). Instead, the rule is satisfied where the findings present the reviewer with "a clear understanding of the basis for the decision." *Id.* In accordance with Rule 52(a), this Memorandum and Opinion first lays out the Court's findings of fact followed by its conclusions of law.

## III.   <u>FINDINGS OF FACT</u>

1. Plaintiff Hui Ye and Defendant Xiang Zhang are friends from high school. (Doc. No. 129 860:8–12). In 2011, Ye and Zhang decided to start a joint venture to bring in goods from

China to sell in the United States. (Pl. Exh. 2 at 5). Ye invested RMB 1 million into the venture and Zhang invested RMB 500,000. (Doc. No. 129 861:7–14).

2. By 2015, the venture was fully established and comprised of six companies in the United States (the "U.S. companies" or "Nominal Defendants"). By this time, the venture had expanded such that the U.S. companies were in the business of selling water filters, both wholesale and via ecommerce; and logistics and fulfillment. The suppliers for the U.S. companies are a network of Chinese companies that are owned by Ye. (Pl. Exh. 22 at 2). Only the U.S. companies are parties to this suit.

3. The U.S. companies are jointly owned by Ye and Zhang, who are also the named Directors of the companies. (Pl. Exh. 2 at 5). The U.S. companies are as follows:

    a. DeltaFill Enterprises, Inc. is a corporation formed under the laws of the State of Texas. Ye owns sixty percent of shares and Zhang owns forty percent of shares. (Doc. No. 6 ¶4).

    b. NuTruFlo, LLC is a limited liability company formed under the laws of the State of Texas. Ye owns sixty percent of shares and Zhang owns forty percent of shares. (Doc. No. 6 ¶5).

    c. DeltaFill Incorporated ("DeltaFill Inc.") is a corporation formed under the laws of the State of Texas. Ye owns sixty percent of shares and Zhang owns forty percent of shares. (Doc. No. 6 ¶6).

    d. OnePurify, LLC is a limited liability company formed under the laws of the State of Texas. Ye owns sixty percent of shares and Zhang owns forty percent of shares. (Doc. No. 6 ¶7).

e. DeltaFill Express Global, LLC ("DeltaFill Express") is a corporation formed under the laws of the State of Texas. Ye owns sixty percent of shares and Zhang owns forty percent of shares. (Doc. No. 6 ¶8).

f. UBuddy, Inc. is a corporation formed under the laws of the State of Texas. Ye owns sixty percent of shares and Zhang owns forty percent of shares. (Doc. No. 6 ¶9).

4. Because Zhang lived in the United States and Ye was unable to travel outside of China, Zhang was placed in charge of managing the U.S. companies.

5. The operation and management of the U.S. companies did not adhere to corporate formalities. (Doc. No. 126 96:9–14). The parties did not follow corporate bylaws. (Doc. No. 127 354:2–9). Instead, the parties' common practice was to require that both Ye and Zhang agree on all "major decisions" relating to the U.S. companies. (Doc. No. 127 362:21–25).

6. Prior to September 2016, the U.S. companies did not have an official accountant. During that period, Wing Lau, who is married to Zhang, helped keep the U.S. companies' books in an unofficial capacity on the weekends. Lau was subsequently hired to work full-time as the Director of Accounting and Human Resources.

7. Between 2014 and 2016, the U.S. companies generated revenue in the amount of $5.4 million. (Doc. No. 127 420:18–24).

8. On January 29, 2015, Ye and Zhang purchased a warehouse located at 15320 Park Row, Houston, Texas 77084 (the "Houston Warehouse" or "Warehouse") on behalf of DeltaFill, Inc. (Pl. Exh. 39 ¶8). The purchase price of the Warehouse was $1,798,500. (Pl. Exh. 2 at 6).

9. The U.S. companies began to decline in 2017. This decline was due in part to defective water filters that gave rise to negative reviews on Amazon where they were sold, (Doc. No. 128 801:1–23), and twelve lawsuits (Doc. No. 126 175:8–23). Beginning in December 2017, the U.S. companies stopped paying invoices to their Chinese suppliers for water filter units. (Doc. No. 129 982:2–8); (Pl. Exh. 2 at 7). The U.S. companies' remaining balance to the Chinese suppliers is approximately $3.6 million. (Pl. Exh. 2 at 7); (Doc. No. 127 414:18–25).

10. In 2018, 250,000 water filter units were shipped to the United States. The parties dispute whether or not Zhang requested the shipment, but the parties agree that any requests or agreements that were made were oral. (Doc. No. 126 253:8–12); (Doc. No. 132 1442:11–1443:3). Ye testified that to fund the production and shipment of these water filters, Ye took out high interest loans that he personally guaranteed in the amount of RMB 10 million. (Doc. No. 129 869:6–20; 871 2–13). Because Ye provided only a summary of the loans without any accompanying records of the date or amount of the loans, the Court finds that it cannot verify the amount of personal loans Ye assumed.

11. Zhang first expressed concerns about the health of the companies to Ye, Ren, and Gu in June 2018. Ren and Gu are friends of Ye and Zhang who were involved with the water filter business. On September 13, 2018, Zhang informed Ye, Ren, and Gu via WeChat that the U.S. companies were suffering financially and in need of cash flow. He proposed selling the Houston Warehouse. Ye never affirmatively consented to selling the warehouse, but "[h]e never objected." (Doc. No. 126 152:11–13).

12. Much of the dispute in this case centers around agreements that were or were not made at a meeting on October 23 and 24, 2018, in Tianjin, China (the "October Meeting"), during

which Zhang, Ye, Ren, and Gu discussed the future of the companies and the sale of the Houston Warehouse.

13. Prior to the October Meeting, Zhang drafted six documents, one for each U.S. company, entitled "Meeting Minutes" (collectively, the "October Resolutions" or the "Resolutions"). (Def. Exh. 3, 11–15). These documents outlined a transfer of ownership of each of the six U.S. companies as follows. Effective November 30, 2018, Ye would become the 100% owner of DeltaFill Inc. (Def. Exh. 3), NuTroFlo LLC (Def. Exh. 12), OnePurify LLC[2] (Def. Exh. 13), and UBuddy, Inc. (Def. Exh. 15); and Zhang would become the 100% owner of DeltaFill Enterprises (Def. Exh. 11) and DeltaFill Express (Def. Exh. 14). The October Resolutions also provided that Zhang "will help change ownership and company registration record in Texas, USA." (Def. Exh. 3, 11–15). These Resolutions were in English and Ye testified that did not understand them.

14. At the October Meeting, on October 24, 2018, Ye and Zhang both signed the October Resolutions. (Def. Exh. 3, 11–15).

15. At the October Meeting, Ye and Zhang also agreed to sell the Houston Warehouse. On October 24, 2018, they signed a Certificate of Resolutions and Incumbency (the "Certificate"), which authorized Lau to execute a contract and other documents related to the sale of the Warehouse on behalf of DeltaFill Inc. (Pl. Exh. 16). The Certificate left blank the address of the Warehouse as well as the sale price. *Id.*

16. Three weeks prior to the October Meeting, in September 2018, Lau had entered into a listing contract with Toby Chen, a realtor, to list the Houston Warehouse on the market.

---

[2]OnePurify LLC's ownership was to transfer to Yitachi Automatic Ltd, which Ye owns, and Ying Lu. (Def. Exh. 13).

(Doc. No. 126 146:5–7). Zhang did not disclose that the Warehouse had been listed at the October Meeting.

17. At the October Meeting, Ye and Zhang also made numerous oral agreements that were not reduced to writing, though the parties now dispute whether some of these were in fact discussed and agreed upon. Ye and Zhang orally agreed on the following: (1) all of the water filter inventory would be transferred to Ye and (2) Zhang would send proceeds from the sale of the water filters in the United States to Ye on a weekly basis beginning on October 23, 2018. (Doc. No. 129 877:1–12); (Doc. No. 127 366:20–368:1).

18. The parties disagree on whether the following agreements were also reached at the October Meeting: (1) Zhang would provide free training to ensure a smooth transfer of the water filter business to Ye; (2) in selling the Houston Warehouse, Zhang would abide by Ye's conditions that the sale price be no less than $2 million and that the realtor fee not exceed 2 percent; and (3) the proceeds from the sale of the Houston Warehouse would be used first to pay back debts in China. (Doc. No. 129 879:1–22). Zhang testified that they did not discuss the first two items at the October Meeting and that he was not aware of Ye's conditions until Ye sent a subsequent proposed agreement. As to the proceeds of the Warehouse sale, Zhang testified that they agreed that the proceeds would be divided 60 percent to Ye and 40 percent to Zhang. (Doc. No. 127 at 366:20-368:1).

19. At the conclusion of the October Meeting, Ye stated that he would draft a Chinese translation of the October Resolutions, which Zhang agreed to sign. (Doc. No. 126 139:9–24). The parties disagree on whether the Chinese version was to be a direct translation or would include further details. (Doc. No. 126 181:21–25); (Doc. No. 128 745:1–25).

20. Following the meeting, Zhang traveled throughout China for business and client meetings. He informed Ye, Ren, and Gu via WeChat that he would have limited access to internet during his business travels. (Doc. No. 127 at 371:10–12); (Def. Exh. 39 10/30/2018 6:31AM).

21. After the meeting, on October 30, 2018, Ye asked Zhang via WeChat to transfer funds. Zhang said that based on their agreed terms, he would transfer funds after deducting certain expenses. (Def. Exh. 39 10/30/2018 6:31AM).

22. On November 16, 2018, Ye sent Zhang via WeChat his Chinese-language version of the October Resolutions, entitled "Resolution of DeltaFill INC Shareholders' Meeting on Ownership Transfer (the "Chinese-Language Resolution"). (Pl. Exh. 20, 22). The Chinese-Language Resolution provided for the same transfer of ownership of the U.S. companies as outlined in the October Resolutions, as well as several other provisions not set out in the October Resolutions including, as relevant here:

    a. Ownership of the U.S. companies was to be transferred such that Zhang would take 100 percent ownership of DeltaFill Express and DeltaFill Enterprises, and Ye would take 100 percent ownership of DeltaFill Inc., OnePurify, NuTruFlo, and Ubuddy, *id.* at 3–4;

    b. The Houston Warehouse was valued at $2 million and Ye must approve of the final sale price, *id.* at 5;

    c. Realtor fees for the sale of the Houston Warehouse should not exceed 2 percent, *id.*;

d.  The proceeds of the sale of the Houston Warehouse would be allocated first to pay down debts to "Tianjin Yuanda Industrial and Trade Co. Ltd."; any leftover proceeds would then be distributed 60 percent to Ye and 40 percent to Zhang, *id.*;

e.  "All of the stock and goods of the U.S.-based companies will belong to" Ye as of October 23, 2018. Zhang must "remit the sale refund" to Ye once per week starting on October 23, 2018, *id.* at 7; and

f.  Zhang "will help [Ye] to handle" the transfer of the companies, *id.*

23. On November 16, 2018, the day Ye sent the Chinese-Language Resolutions, Zhang acknowledged receipt of the proposed agreement. (Def. Exh. 39, 11/16/2018 2:12AM). He stated that he would review the document the following week because he was fully booked with clients for the next few days.

24. On November 20, 2018, Ye convened a shareholder meeting at which he was the only individual present (the "November Meeting"). Ye had notified Zhang of the meeting on November 18 or 19, 2018. (Def. Exh. 39, 11/18/2018 9:37PM); (Pl. Exh. 20 11/21). At that meeting, Ye signed the Chinese-Language Resolution. He also signed a resolution to terminate the Certificate authorizing Zhang and Lau to sell the Houston Warehouse on behalf of DeltaFill Inc. *Id.* The latter resolution provided that, instead, "Ye, the biggest shareholder, will authorize a local real estate brokerage agency in Houston to sell it." (Pl. Exh. 24). Ye was the only signatory of the resolutions.

25. Ye informed Zhang of the outcome of the November Meeting via WeChat on November 20 or 21, 2018. (Pl. Exh. 20); (Def. Exh. 39, 11/20/2018 10:18PM). In his message, Ye stated that the resolutions were valid because company rules permit passing resolutions by majority vote, and he was the majority shareholder in DeltaFill Inc. *Id.*

26. Zhang returned to the United States on November 20, 2018. (Doc. No. 127 371:10–12).

27. On November 20, 2018, Zhang informed Ye via WeChat that he did not approve of the Chinese-Language Resolution. He stated that the proposed agreement listed terms that were not found in the October Resolutions, and that he would only recognize terms that they had agreed and signed on in the October Resolutions. (Def. Exh. 39, 11/21/2018 5:08PM); (Pl. Exh. 20, 11/22/2018 9:08PM).

28. After Ye filed the present lawsuit, in January 19, 2019, this Court appointed an auditor, Katie Hou, to conduct a forensic audit of the corporate records and books of each U.S. company. (Doc. No. 14 ¶6(a)). Hou's forensic audit found the following:

   a. The accounting and record-keeping practices of the U.S. companies were lacking and not compliant with Generally Accepted Accounting Principles ("GAAP"). Because Hou could not many records, numerous transactions could not be verified ("unconfirmed transactions"). (Doc. No. 127 463:9–17).

   b. There was an unusual number of related-party transactions. (Doc. No. 127 396:19–21). The amount spent on shipping labels did not match the amount of e-commerce sales. (Doc. No. 127 at 425:19-23).

   c. There was no evidence that funds or assets had been transferred from the U.S. companies to Zhang or Lau's personal bank accounts. (Doc. No. 127 481:6–11).

## IV.  CONCLUSIONS OF LAW

At issue are Ye's claims against Zhang for promissory estoppel, fraudulent inducement and misrepresentation, theft under the TTLA, and breach of fiduciary duty. The Court issues conclusions of law as to each claim in turn.

A.    **Promissory Estoppel**

The Court turns first to Ye's claims against Zhang for promissory estoppel. Texas applies the Restatement definition of promissory estoppel, which requires: (1) a promise, (2) "foreseeability of reliance thereon by the promisor," (3) "substantial reliance by the promisee to his detriment," and (4) "a definite finding that injustice can be avoided only by the enforcement of the promise." *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 864 (5th Cir. 1999) (citation omitted); *see Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 636 (Tex. 1997); *see also* Restatement (Second) of Contracts, § 90.

The asserted promise "must be sufficiently specific and definite so that it would be reasonable and justified for the promisee to rely on it as a commitment to future action." *Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97, 108 (Tex. Ct. App. 2015). The purported promise also must "be more than speculation of future events, a statement of hope, an expression of opinion, an expectation, or an assumption." *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 305 (Tex. Ct. App. 2009).

To support his claim for promissory estoppel, Ye in post-trial briefing points to five promises that he claims Zhang made and that he detrimentally relied upon in agreeing to sign the October Resolutions. (Doc. No. 134-1 at 10). These include: (1) "Zhang would protect and grow Ye's investment by faithfully carrying out his role as Vice President of NDs and act not in a self-serving manner but to safeguard the interests of the NDs," (2) Zhang would provide "complimentary personnel, training and services" to facilitate a smooth transition of the water filter business to Ye, (3) Ye would receive OnePurify's inventory sale and accounts receivable proceeds, (4) Ye would receive all proceeds from the sale of the Houston Warehouse, and (5) the Houston

Warehouse would be sold in accordance with Ye's conditions. *Id.* The Court addresses each asserted promise in turn.

As to the first and second alleged promises, even assuming that Zhang made these promises, they are insufficiently specific or definite to render any reliance by Ye reasonable. *Davis*, 470 S.W.3d 97, 108 (Tex. App. 2015). Texas courts have held that promises that are too vague cannot support a finding of detrimental reliance. *See, e.g.*, *Allied Vista Inc. v. Holt*, 987 S.W.2d 138, 142 (Tex. App. 1999). In *Allied Vista*, for instance, the court held that where the defendant promised to supply equipment for a recycling plant but the parties never discussed what specific items of equipment would be forthcoming, the promise was "too vague to support detrimental reliance." *Id.* at 141–42. The court concluded thus that the plaintiff's reliance on the asserted promise was unreasonable as a matter of law. *Id.*

Here, Zhang's first alleged promise to "protect and grow Ye's investment" and to "safeguard the interests of the" companies, (Doc. No. 134-1 at 10), is even less certain than that in *Allied Vista*. Critically, the asserted promise fails to specify how the objectives are to be realized. Such vagueness undermines the reasonableness of Ye's reliance upon it. *See Jani-King Franchising, Inc. v. Jani-King (GB) Ltd.*, 3:13-CV-4136-P, 2016 WL 7680527, at *3 (N.D. Tex. Feb. 25, 2016) (finding that a promise that changes will be made to a franchise system was too indefinite because "it is not clear, either quantitatively or qualitatively, what changes will be made"). The second asserted promise that Zhang would provide "complimentary personnel, training and services to facilitate [a smooth transition] until Ye could get his own team in place to take over fully" similarly lacks sufficient specificity. (Doc. No. 134-1 at 10). The nature and extent of the training and services to be provided, as well as the duration of those services, particularly

given that Ye remained unable to leave China, are left uncertain.  Accordingly, these alleged promises are too vague to support detrimental reliance as required for promissory estoppel.

Similarly, Ye's reliance on the third asserted promise that Zhang would send sale "proceeds" to Ye was not reasonable for the purposes of promissory estoppel. Texas courts "have emphasized that 'estoppel requires a *reasonable* or *justified* reliance on the conduct or statement of the person sought to be estopped by the person seeking the benefits of the doctrine.'" *Hartford Fire Ins. Co. v. Mont Belvieu*, 611 F.3d 289, 297 (5th Cir. 2010) (quoting *Allied Vista*, 987 S.W.2d at 142). In this case, Ye claims that he detrimentally relied on Zhang's promise that he would send Ye OnePurify's "inventory sale and accounts receivable proceeds" on a weekly basis, which he failed to do. (Doc. No. 134-1 at 10). The central dispute, however, is not whether Zhang made such a promise, but rather what proceeds—gross or net—were intended. At trial, Zhang testified that while he agreed to send proceeds from water filter sales to Ye, he understood the agreement to encompass *net* proceeds. *See* (Doc. No. 127 at 366:20–368:1; 368:2–13). Because expenses exceeded sales from the water filters, there was, according to Zhang, "no money to send back." (Doc. No. 127 at 368:2–13). A WeChat message from Zhang shortly after the October 2018 meeting supports Zhang's testimony that he understood proceeds to mean net proceeds. In response to Ye's message requesting a payment transfer of the "sales amount," Zhang stated that "[b]ased on previously agreed terms" he would deduct, among others, Warehouse storage fees and operating expenses "from the sales amount before transferring back the remainder." (Def. Exh. 39 at 1).

Ultimately, the Court need not decide whether the parties agreed to transfer gross or net proceeds to conclude that Ye was unreasonable in relying on a promise of "proceeds" generally. In a case such as this, where the companies continued to operate and incur costs, reasonable

reliance would have required, at a minimum, clarifying whether any such costs would be deducted from the sale of water filters prior to transfer. Ye did not present any evidence that he ever requested such clarification or that Zhang promised to transfer *gross* proceeds. Under these circumstances, Ye has not shown that his reliance was reasonable for the purposes of promissory estoppel.

Finally, as to the last two asserted promises related to the sale of the Houston Warehouse, the Court, after reviewing the record evidence and trial testimony, cannot conclude that Ye has demonstrated that Zhang in fact made these promises at the October Meeting. Because the October Resolutions are the only documentation of what transpired at the October Meeting, there is no written evidence to corroborate Ye and Zhang's competing testimony about what agreements were reached. To support his position, Ye relies on the testimony of Ren, who was present at the October Meeting. Ren, however, did not testify as to any requirement that the Warehouse be sold for no less than $2 million or that the realtor fee be no more than 2 percent. And while Ren testified as to the sale proceeds from the Warehouse, his testimony was far from clear. In response to the Court's query about what agreement was reached as to the sales proceeds, Ren testified that "[i]t is for sure that the sales proceeds of the [W]arehouse should be used by both sides," and that Ye expressed that the proceeds "be preferably used for paying back the debts." (Doc. No. 128 756:21–747:4). After repeated questioning, Ren subsequently stated that Zhang agreed to use the proceeds to pay debts in China. (Doc. No. 128 757:10–758:4). After reviewing the evidence presented, the Court concludes that the evidence is insufficient to support the first element of promissory estoppel—that promises were made—as to Plaintiff's fourth and fifth theories.

The Court accordingly **GRANTS** Zhang's Motion for Judgment on Partial Findings as to Ye's promissory estoppel claim.

15

## B.      Fraudulent Inducement

The Court turns next to Ye's contention that he has sufficiently established that Zhang fraudulently induced him to enter into several agreements. Fraudulent inducement is a "'species of common-law fraud' that 'arises only in the context of a contract.'" *Int'l Bus. Machs. Corp. v. Lufkin Indus. LLC*, 573 S.W.3d 224, 228 (Tex. 2019) (quoting *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018)); *see Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001) ("Without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim."). Accordingly, the elements of fraud must be established as they relate to an agreement between the parties. *Coastal Bank ssb v. Chase Bank of Tex., N.A.*, 135 S.W.3d 840, 843 (Tex. Ct. App. 2004). Here, Ye's claims revolve around two contracts that Zhang allegedly induced him to sign through misrepresentations: the Certificate and the October Resolutions.[3]

A plaintiff seeking to prevail on a fraudulent inducement or fraudulent misrepresentation claim must prove: "(1) a material misrepresentation, (2) the representation was false, (3) the defendant either knew the representation was false or recklessly asserted it without knowledge of its truth, (4) the defendant intended that the plaintiff should act upon the representation, (5) the plaintiff acted in reliance on the representation, and (6) the plaintiff was injured as a result." *Harris Cty. v. MERSCORP Inc.*, 791 F.3d 545, 558 (5th Cir. 2015) (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011)).

---

[3]Ye also appears to claim that Zhang induced him "to suppl[y] Zhang 250,000 water filter units in 2018." (Doc. No. 134-1 at 19). Whether this agreement may form the basis for a fraudulent inducement claim is tenuous, as Texas courts require a binding agreement. *See Haase*, 62 S.W.3d at 798. At trial, Zhang testified that there was never a written agreement for the importation of water filter units. (Doc. No. 126 253:8–12). Ye did not present evidence of such a contract; instead, Plaintiff's counsel described the agreement as a series of verbal requests from Zhang, (Doc. No. 132 1442:11–1443:3), which Ye, presumably, could have declined to heed. In any event, even if the agreement could form the basis for a fraudulent inducement claim, Plaintiff has not established by a preponderance of the evidence that Zhang acted with fraudulent intent.

A material misrepresentation is one which "a reasonable person would attach importance to and would be induced to act on . . . in determining his choice of actions in the transaction in question." *Samson Lone Start Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 13–14 (Tex. App. 2016) (quoting *Italian Cowboy Partners*, 341 S.W.3d at 337). "Vague representations cannot constitute a material representation." *Id.* at 14 (quoting *Cadle Co. v. Davis*, No. 04-09-00763-CV, 2010 WL 5545389, at *8 (Tex Ct. App. Dec. 29, 2010)). Texas courts, however, have held that remaining silent when a party has a duty to speak may constitute a false misrepresentation. *See Omni USA, Inc. v. Parker-Hannifin Corp.*, 798 F. Supp. 2d 831, 851 n.16 (S.D. Tex. 2011) (quoting *In re Int'l Profit Assocs.*, 274 S.W.3d 672, 678 (Tex. 2009)). A plaintiff's reliance on any claimed representation must be "justifiable." *LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, LLC*, 659 F.3d 450, 458–59 (5th Cir. 2011).

The intent requirement for fraudulent inducement "may be inferred from the party's subsequent acts after the representation is made." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Because intent to defraud is not susceptible to direct proof, it may be proven by "slight circumstantial evidence" of fraud. *Id.* at 435. "Intent is a fact question uniquely within the realm of the trier of fact because it so depends on the credibility of the witnesses and the weight to be given to their testimony." *In re Rose*, No. 17-42053, 2019 WL 4741667, at *34 (Bankr. E.D. Tex. Sept. 27, 2019) (quoting *Spoljaric*, 708 S.W.2d at 434).

The Court addresses Ye's claims of inducement as they relate to each of the two agreements in turn.

### 2.     The Certificate

Ye first contends that Zhang intentionally induced him to sign the blank Certificate authorizing Zhang to sell the Houston Warehouse by making representations that he knew were

false. To support his argument, Ye points to several alleged representations: (1) Zhang represented that he would abide by Ye's preferred conditions in selling the Warehouse, (2) Zhang represented that the proceeds of the sale would go to pay off debts owed to Chinese creditors, and (3) Zhang concealed the fact that Lau had entered into a listing contract for the Warehouse three weeks prior.

The Court turns first to whether the evidence supports a finding that these material representations were made. The Court acknowledges that Ye's first two alleged representations, if made, may well have been material to any decision to sign the Certificate. As this Court discussed *supra*, however, Ye has not established that Zhang in fact agreed to the conditions of the sale or the distribution of the proceeds at the time the contract was signed. Weighing the credibility of testimony at trial, the Court determines that Zhang did not make any such representations at the time the Certificate was signed and, accordingly, Ye could not have been induced to sign the Certificate on this basis. The Court finds, however, that Zhang did make the third representation— failing to disclose that the Warehouse was being listed. The parties do not dispute that Zhang did not divulge this information at the October Meeting, and failure to disclose may constitute a misrepresentation. *See Omni USA*, 798 F. Supp. 2d at 851 n.16 (quoting *In re Int'l Profit Assocs.*, 274 S.W.3d at 678).

Even assuming, however, that Zhang's silence constitutes a material misrepresentation, Ye's fraudulent inducement claim fails because Ye has failed to sufficiently establish that his reliance on that misrepresentation was justifiable. Texas courts have opined that justifiable reliance is a "fact-intensive inquiry" in which courts consider the "fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud." *IAS Servs. Grp., L.L.C. v. Jim Buckley & Assocs.*, 900 F.3d 640, 650 (5th Cir. 2018) (internal quotation marks omitted) (quoting *Grant Thornton LLP v. Prospect High Income Fund*,

314 S.W.3d 913, 923 (Tex. 2010)). At bottom, Ye, an experienced businessman, signed a blank

contract to sell what in his own words was the U.S. companies' most valuable asset. (Doc. No. 129

878:16–21). Yet, there can be no justifiable reliance on a representation if there are "red flags,"

which the blank contract in this case certainly raised. *Id.* This is especially true given the value of

the property at issue and that the concealed representation in question—that the Warehouse was

listed prior to the October Meeting—did not create any obligation to ultimately sell the Warehouse.

While reliance need not be prudent, it must be justifiable; and under these circumstances, the

evidence does not support concluding that Ye's reliance meets either standard.

The Court accordingly rejects Ye's claims for fraudulent inducement as to the Certificate.

### 3.     October 2018 Resolutions

Ye also contends that Zhang fraudulently induced him to sign the October Resolutions,

which provided for restructuring ownership of the U.S. companies. To support his argument, Ye

points to the following alleged misrepresentations: (1) Zhang misrepresented that he would give

Ye 100 percent of the proceeds from water filter sales; (2) Zhang misrepresented that the "English-

language meeting minutes were an accurate summary of the parties' agreement and a more

comprehensive Chinese-language document would be executed later," (Doc. No. 134-1 at 20); and

(3) Zhang misrepresented through silence the operational health and profitability of the entities he

would retain in the transfer of ownership, including that DeltaFill Express was profitable. The

Court addresses each alleged misrepresentation in turn.

To begin, as the Court discussed at length *supra*, Zhang testified that he agreed to give Ye

*net* proceeds, not *gross* proceeds, from the water filter sales. This finding undercuts Ye's ability to

satisfy the knowing representation and intent elements of his fraudulent concealment claim. "A

promise of future performance constitutes an actionable misrepresentation if the promise was made

19

with no intention of performing it at the time it was made." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) (citing *Schindler v. Austwell Farmers Coop.*, 841 S.W.2d 853, 854 (Tex. 1992)). While it is undisputed that Ye has to date received no sales proceeds from Zhang, Ye has not shown that Zhang lacked any intent to perform what he understood the agreement to encompass: sending Ye the net sale proceeds. Indeed, Zhang testified at trial that he did not send Ye any proceeds because no such excess funds existed after the requisite costs were deducted. (Doc. No. 127 368:2–13). Under these circumstances, Ye has not demonstrated that Zhang made a representation that he knew to be false and upon which he intended Ye to detrimentally rely.

Ye next contends that Zhang induced him to sign the October Resolutions by misrepresenting that the Resolutions accurately summarized the parties' agreement and that he would sign Ye's subsequent Chinese version. Ye testified at trial that he would not have signed the October Resolutions had he known that Zhang would not sign the Chinese-Language Resolution. (Doc. No. 129 887:22–888:1). Even assuming Ye made these representations, however, Ye has not established justifiable reliance. To the extent Ye relied on Zhang's representations about the accuracy of the Resolutions because Ye could not read the English version, Texas courts decline to find reliance justifiable if there was the opportunity to read a contract prior to signing it. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424–25 (Tex. 2015) (finding no justifiable reliance where testimony established that plaintiff had ample opportunity to read the release but instead chose to rely on the representations because he was in a hurry and did not have his reading glasses with him); *see also* (Doc. No. 129 875:5–9). While Ye claims that the parties were rushed to sign the documents, he could have obtained a translation over the course of the two-day October Meeting. Moreover, Ye could not justifiably rely on

Zhang's promise at the October Meeting to sign a future contract that was not yet written and that he had neither reviewed nor approved. The Court accordingly concludes that Ye has not established that he was fraudulently induced on these grounds.

Finally, Ye contends that Zhang misrepresented and concealed information about the operational and financial health of the U.S. companies, including that DeltaFill Express was in fact profitable. Ye testified at trial that he would not have signed the English Resolutions had he known that one of the U.S. companies may have been turning a profit. (Doc. No. 129 865:9–18). The question is whether Ye has demonstrated that, at the time he signed the October Resolutions, Zhang made representations about the profitability of the U.S. companies that he knew were false and Ye justifiably relied on those misrepresentations. The Court must conclude that he has not on either front.

At trial, Ye testified that Zhang stated at the October Meeting that all of the U.S. companies, including DeltaFill Express, were suffering financially. (Doc. No. 126 269:2–25). To support his contention that Zhang knowingly omitted that DeltaFill Express was in fact profitable, Ye relies on the auditor's testimony at trial that, based on profit and loss financial reports obtained from the company's records, DeltaFill Express made a profit of $170,684 in 2018. (Doc. No. 128 657:14–659:22); (Doc. No. 127 478:1–4). The auditor, however, subsequently qualified her profit calculation after conceding that she reached her conclusion without full information. (Doc. No. 128 660:22–661:12). She testified that her calculation was based solely on DeltaFill Express's financial records and that the profit amount may well change if she also reviewed the company's 2018 tax return. (Doc. No. 128 660:12–18). Because Ye relies on the auditor's testimony about DeltaFill's profitability, and because the auditor qualified her own testimony, the Court concludes

that Ye has not established that DeltaFill Express was profitable and thus that Zhang knowingly misrepresented material information.

Nor has Ye demonstrated that he justifiably relied on Zhang's alleged representations about the U.S. companies' financial health in signing the October 2018 Resolutions. To begin, the Resolutions sought to fundamentally overhaul the operations of, and Ye's ownership in, the six U.S. companies. The import of what was at stake, especially in light of Ye's business experience, calls into question Ye's claimed reliance on Zhang's statements in agreeing to so fundamental a shift. *See IAS Servs. Grp.*, 900 F.3d at 650 (explaining that courts consider the "plaintiff's individual characteristics" and "appreciation of facts and circumstances" to determine actual reliance). This is particularly true given that, by October 2018, Ye had some independent basis to question whether the U.S. companies were in such dire financial straits that splitting the venture was necessary. On one hand, Ye's trial testimony indicated that he became aware of the companies' poor financial health beginning in 2017. (Doc. No. 131 1214:19–22); (Doc. No. 129 982:2–8). He testified, for instance, that he sent a friend to the United States to assess the state of the companies; his friend reported that it was "very bad." (Doc. No. 131 1214:23–1215:12). On the other hand, Ye repeatedly testified that as late as 2018 Zhang requested that 250,000 water filter units be sent to the United States. That Ye subsequently decided to take out RMB 10 million in loans to fund production suggests that Ye had some reason, even if slight, to question whether the companies were still viable. (Doc. No. 129 869:6-20; 871:10–13). At the very least, given this contradicting information, Ye did not justifiably rely on Zhang's representations without undertaking additional investigation. *See, e.g.*, *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003) (holding that plaintiff's decision to enter into transaction without undertaking additional investigation into tax consequences was not justifiable given his access to professional

22

accountants, the amount of money involved, and the ambiguous nature of the defendant's representations). The Court appreciates that Zhang was charged with managing the U.S. operations and thus that some level of reliance on Zhang's reports as to their status may be merited. *Justifiable* reliance, however, has bounds, beyond which Ye has traversed in this case. The Court thus concludes that Ye has not established fraudulent inducement on these grounds.

The Court accordingly **GRANTS** Zhang's Motion for Judgment on Partial Findings as to Ye's fraudulent inducement and fraudulent misrepresentation claim.

## C.      Texas Theft Liability Act

Ye contends that he has presented sufficient evidence to establish his claims under the Texas Theft Liability Act (the "TTLA"). Under the TTLA, a person who commits "theft"—here, the unlawful appropriation of property under Texas Penal Code § 31.03—is liable for the damages resulting from the theft. *See* Tex. Civ. Prac. Rem. Code Ann. § 134.003; *Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, 571 S.W.3d 346, 363 (Tex. Ct. App. 2018). A person commits theft under § 31.03 when he "unlawfully appropriates property with *intent* to deprive the owner of property." Tex. Penal Code Ann. § 31.03(a)-(b) (2017) (emphasis added).

Appropriation occurs when a party "bring[s] about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or to acquire or otherwise exercise control over property other than real property." *Bynari, Inc. v. Alt-N Techs., Ltd.*, 3:08-CV-242-L, 2008 WL 4790977, at *4 (N.D. Tex. Oct. 24, 2008) (quoting Tex. Penal Code Ann. § 31.01(4) (2017)). Appropriation is unlawful if it is "without the owner's effective consent." Tex. Penal Code Ann. § 31.03(b)(1) (2017). Intent to deprive means intent "to withhold property from the owner permanently or for so extended a period of time that a major proportion of the property is lost to the owner." *Id.* § 31.01(2)(A). Intent to deprive is considered at the time

23

of the taking. *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 906 (Tex. App. 2014). Absent a direct admission, intent is typically inferred from circumstantial evidence such as the words and acts of the person. *See id.*; *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and . . . conduct.").

Ye contends that Zhang unlawfully appropriated (1) revenue and assets of the U.S. companies, (3) both the sales proceeds from the Houston Warehouse and the Warehouse itself by selling it without Ye's consent, (4) company shipping stamps, and (5) tax refunds due to Ye. (Doc. No. 134-1 at 31). The Court addresses each Plaintiff's theory of theft in turn, and concludes that the evidence is insufficient to support a finding that Zhang acted with the requisite intent to deprive under each claim of theft.

Ye first contends that Zhang unlawfully appropriated company revenue and assets by commingling the U.S. companies' accounts and assets, routing all ecommerce revenue to DeltaFill Enterprise's bank account without authorization, blocking Ye's access to the SmartCenter, failing to pay $3.6 million to Chinese suppliers for water filter inventory, and transferring OnePurify's inventory of water filters to DeltaFill Enterprise without appropriate recompense and accounting. The Court begins by observing that several of Zhang's management decisions certainly strayed from best business practices. Testimony from the auditor, for instance, highlighted an unusual number of "related-party transactions." (Doc. No. 127 396:19–21). The auditor pointed to Defendant's practice of having the U.S. companies who were using the Houston Warehouse for storage pay down the property mortgage to the bank directly rather than pay rent to DeltaFill Inc., who was the mortgagee. (Doc. No. 127 389:23–390:7).

24

Ill-advised business decisions, however, do not necessarily amount to impermissible intent to deprive. While Zhang internally shifted company revenue and assets without always observing corporate boundaries and used funds from some companies to pay down the debt of other companies, those funds and assets remained within the six companies. Critically, the auditor found no evidence that funds or other assets had been transferred from the U.S. companies to Zhang or his wife Lau's personal bank accounts. (Doc. No. 127 481:6–11); *see McCullough*, 435 S.W.3d at 906–07; *see also Sky Group, LLC v. Vega Street 1, LLC*, No. 05-17-00161-CV, 2018 WL 1149787, at *6 (Tex. App. Mar. 5, 2018) (finding no violation of TTLA where there was no evidence establishing that appellants affirmatively refused to return or intended to exercise dominion over the property at issue). Nor did the auditor find evidence that funds or assets had been impermissibly transferred out of the six U.S. companies. While the auditor found an unusual number of unconfirmed transactions, she testified that that deficiency may be due to poor record keeping, rather than fraudulent transactions. (Doc. No. 172 526:22–527:2). This evidence does not establish an intent to "withhold property from the owner permanently." Tex. Penal Code Ann. § 31.01(2)(A) (2017).

The strongest circumstantial evidence of intent is that, between 2015 and 2017, the total assets of the two companies that Zhang was to take over increased while the total assets of the other companies decreased. The auditor testified at trial that, according to company balance sheets, OnePurify's total assets decreased from $2.35 million in 2016 to $844,000 in 2017; by contrast, DeltaFill Enterprise's total assets increased from $109,900 to $2.585 million between 2015 and 2017. (Doc. No. 127 451:14–452:5; 453:4–19). While this evidence ostensibly demonstrates Zhang's intent to funnel assets into the companies he would later take over, Plaintiff's argument folds under scrutiny. Critically, the evidence focuses only on the total assets of the companies and

thus, absent more complete evidence such as the corresponding liabilities of each company during that time period, fails to persuasively show that there was in fact a transfer of wealth or future windfall to Zhang. The insufficiency of this evidence is illustrated in the 2017 transfer of $1.2 million worth of water filter inventory from OnePurify to DeltaFill Enterprises. While a review of DeltaFill Enterprises's total assets following this transfer would show a significant increase, the asset records alone would not reflect that, according to the auditor and contrary to Ye's contentions, DeltaFill Enterprises paid a total of $1.2 million for that inventory through a combination of cash and accounts payable.[4] (Doc. No. 127 447:15–448:14). In sum the record evidence does not establish that Zhang acted with any intent to deprive. The Court concludes that Ye has not sufficiently established a violation of the TTLA with respect to the revenue and assets of the U.S. companies.

The Court turns next to Ye's claims of theft as to the Houston Warehouse. Ye contends that Zhang appropriated the proceeds of the sale of the Houston Warehouse by refusing to transfer the sale proceeds to Ye to pay debts in China. As the Court has discussed *supra*, however, Ye has not established that the parties in fact agreed that Ye would receive 100 percent of the sales proceeds. Given Zhang's testimony that he believed the proceeds would be divided between the parties in proportions equal to their shares and that Zhang did not keep the proceeds but instead submitted them to the registry of this Court, the evidence does not sufficiently establish that Zhang intended to deprive Ye of the entire sum of the sale proceeds under the TTLA.

Ye's contention that Zhang unlawfully appropriated the Houston Warehouse itself similarly falls short. Ye contends that Zhang stole the Houston Warehouse by not heeding Ye's

---

[4]As to the water filter inventory, the Court notes that Zhang testified that he not only agreed that the water filters belong to Ye, but that he has in fact previously tried to return the water filters to Ye. (Doc. No. 126 250:19–251:7); (Doc. No. 126 252:1–9). Thus, to the extent the transfer of water filters to DeltaFill Enterprise may appear suspicious, Zhang has disclaimed and permanent possession of the water filters.

conditions for the sale or his subsequent revocation of authorization. To show that Zhang unlawfully appropriated the Warehouse, Ye must show that Zhang intended to sell the Warehouse "*without the owner's effective consent.*" *Bynari, Inc.*, 2008 WL 4790977, at *4; Tex. Penal Code Ann. § 31.03(a), (b)(1) (2017) (emphasis added). The evidence adduced at trial, however, suggests that Zhang believed that he was authorized by a corporate resolution, the Certificate, to sell the Warehouse. Zhang testified that all "major decisions" involving the corporations, including revoking a prior agreement or authorization, required agreement by both parties even though they did not own equal shares in the U.S. companies. (Doc. No. 127 at 362:2–25). In this case, Ye and Zhang agreed at the October Meeting to authorize Zhang to sell the Warehouse on behalf of DeltaFill Inc. and issued a corporate resolution to that effect through the Certificate. That agreement, as discussed *supra*, did not contain Ye's conditions of sale. With this joint resolution in place, Ye's subsequent unilateral resolution revoking Zhang's authorization was not, according to Zhang, a valid resolution. Zhang thus believed at the time of the Warehouse sale that he had the consent of the owner, DeltaFill Inc. through the Certificate, to proceed with the sale. Under these circumstances, the Court concludes that the evidence does not establish that Zhang unlawfully appropriated the Houston Warehouse with intent to deprive.

Ye next contends that Zhang stole shipping stamps from the U.S. companies. As the auditor noted in the auditor report and testified at trial, the amount spent on shipping labels did not match the amount of e-commerce sales, and thus there was a "risk of misappropriation of the company's shipping stamps." (Doc. No. 127 at 425:19-23). Hou testified that there was "a risk that [Zhang] used shipping stamps for other purposes." (Doc. No. 127 437:16–25). The auditor fell short, however, of concluding that Zhang had in fact used shipping labels for purposes unrelated to the U.S. companies. While the auditor testified that the shipping labels could have been used for

another business or sold on an online platform like e-bay, (Doc. No. 128 619:2–17), she acknowledged that this was not a common form of fraud and that she encountered no evidence that Zhang had engaged in such conduct. (Doc. No. 127 437:5–438:21; 440:7–17; 482:6–8). In the absence of such evidence, the Court concludes that other plausible explanations account for the incongruity between shipping label costs and e-commerce sales. For instance, poor record-keeping on behalf of the companies or errors in the shipping process. Accordingly, the Court concludes that whether unlawful appropriation of shipping stamps occurred is tenuous and the evidence is insufficient to establish that Zhang acted with the requisite intent to deprive.

Finally, Ye argued for the first time at trial that Zhang appropriated Ye's individual tax refund for the 2014, 2015, and 2016 tax years. Testimony at trial established that Lau prepared Ye's individual tax returns for those years and OnePurify paid the estimated tax burden. (Doc. No. 127 505:18–22). The Internal Revenue Service provided a refund of $48,538, which was deposited into OnePurify's company bank account without Ye's knowledge. *Id.* While Ye acknowledges that OnePurify paid his taxes, he nonetheless contends that he was personally owed the refund, pointing to the auditor's trial testimony that an individual's tax refund should be deposited into that individual's bank account absent an agreement to the contrary. (Doc. No. X) (citing Doc. No. 128 715:2–8).

The Court need not decide whether depositing the refund back into OnePurify's account, rather than Ye's personal account, constitutes an appropriation because, in any event, there is no evidence that Zhang intended to permanently deprive Ye of the funds. This is not a case in which the record reflects that Zhang knew that he was supposed to deposit the money into Ye's bank account, that Ye specifically directed Zhang to do so, or that Ye requested that Zhang return the deposited funds. *See McCullough*, 435 S.W. 3d at 907 (finding intent where individual deposited

money that belonged to the company into his personal accounts even though he knew that the payments belonged to the company, the company requested that he change the payment structure, and he knew that he should have turned the money over). In this case, after receiving the tax refund, Zhang deposited the funds back into OnePurify's company account, which paid the tax return in the first place. Absent evidence to the contrary, and given that there was no vote to distribute funds to Ye, Zhang's conduct reflects an honest belief that the funds ought to be returned to the account from which they originated. Significantly, Zhang deposited the funds back into OnePurify's bank account, rather than his personal bank account. The Court acknowledges that best practice would have counseled reaching an agreement about how to pay the tax return and where the refund should be deposited; however, as this Court has emphasized, many formalities were unheeded in the operation and management of these businesses. The Court concludes that there was no intent to permanently deprive for the purposes of the TTLA.

Accordingly, the Court determines that the evidence adduced at trial was factually and legally insufficient to support Ye's claim against Zhang for civil theft under the TTLA. The Court **GRANTS** Zhang's Motion for Judgment on Partial Findings as to Ye's TTLA claim.

### D.    Breach of Fiduciary Duty (individually and derivatively)

Finally, Ye contends that Zhang breached his fiduciary obligations of good faith, care, loyalty, and candor that he owed to the U.S. companies and Ye. (Doc. No. 134-1 at 26). Ye asserts these breach of fiduciary duty claims individually, as an investor and shareholder, and derivatively, on behalf of the nominal defendants. Under Texas law, to prevail on a claim of breach of fiduciary duty, a plaintiff must prove that (1) a fiduciary relationship existed between plaintiff and defendant, (2) the defendant breached his fiduciary duty to the plaintiff, and (3) the defendant's breach caused injury to the plaintiff or benefit to the defendant. *Navigant Consulting, Inc. v.*

*Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. 2006)).

1.     Existence of a Fiduciary Duty

The Court must first determine whether and to whom Zhang owes a fiduciary duty. Ye contends that Zhang owes fiduciary duties both to Ye as an individual shareholder and the U.S. companies. Zhang appears to contend that because he is a mere shareholder, he does not owe any fiduciary duties to either. The Court agrees with Zhang's latter assertion but cannot agree with the former.

To begin, Zhang correctly contends that, in Texas courts, minority shareholders do not owe a fiduciary duty to other shareholders as a matter of law. *See, e.g.*, *Lee v. Hasson*, 286 S.W.3d 1, 14 (Tex. App. 2007); *Ritchie v. Rupe*, 443 S.W.3d 856, 874 n.27 (Tex. 2014). Zhang, however, is more than a shareholder with respect to the U.S. companies. Zhang clearly served as a director of the companies both in substance and in title. Indeed, in the documents at the heart of this dispute, Zhang signed as a "Director." *See, e.g.*, (Pl. Exh. 3, 11–15); (Pl. Exh. 16). It is well settled in Texas courts that officers and directors owe a corporation the fiduciary "duties of obedience, loyalty, and due care." *Gearhart Indus., Inc. v. Smith Int'l Inc.*, 741 F.2d 707, 719 (5th Cir. 1984); *Ritchie*, 443 S.W.3d at 883. Accordingly, Zhang owes fiduciary duties to the U.S. companies.

However, Zhang's duty of obedience, loyalty, and care runs to the *corporation*, not to individual shareholders or even to a majority of the shareholders. *Gearhart Indus.*, 741 F.2d at 721 ("[A] cause of action for breach of directors' fiduciary duties belongs to the corporation and cannot be brought by a stockholder in his own right, nor can the shareholder directly prosecute the suit in the name of the corporation."). Zhang therefore owes a fiduciary duty to Ye, and Ye may proceed with his individual claims, only if Ye can establish that an informal fiduciary relationship

30

existed or that Zhang otherwise owes him a duty that is separate and apart from that which he owes the U.S. companies. The Court concludes that Ye cannot establish either.

An informal fiduciary relationships exists when the record shows that one of the parties relied on the other "for moral, financial, or personal support or guidance," *Lee*, 286 S.W.3d at 15 (quoting *Trostle v. Trostle*, 77 S.W.3d 908, 915 (Tex. App. 2002)), and that "there exists a long association in a business relationship, as well as personal relationship." *Ritchie v. Rupe*, No. 05-08-00615-CV, 2016 WL 145581, at *4 (Tex. App. Jan. 12, 2016) (quoting *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App. 1997)). Ye contends that an informal fiduciary relationship existed between him and Zhang because, as Ye testified, he has considered Zhang his old friend and brother since they met in high school in 1985 and they have been business partners since 2010. (Doc. No. 129 860:8–19); (Doc. No. 134-1 at 26). Texas courts have cautioned, however, that fiduciary relationships "are not lightly created" and "require extraordinary facts." *Lee*, 286 S.W.3d at 19; *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). The parties in *Lee v. Hansson* presented such extraordinary facts where they were longtime friend with an "unusually" close relationship in which they and their families not only vacationed together, but in fact "practically lived together." 286 S.W.3d at 16. Moreover, the plaintiff testified to specific facts illustrating her reliance and trust in the defendant. Here, while Ye claims that he considered Zhang to be like a brother, the record is bereft of extraordinary facts sufficient to render this one of the "rare example[s]" where a relationship gives rise to a legally cognizable fiduciary duty. *Id.* at 19. "Mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship." *Ritchie*, 2016 WL 145581, at *4 (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)). The Court accordingly concludes that Zhang does not owe fiduciary duties to Ye through an informal fiduciary relationship.

Nor has Ye established that Zhang owes him a duty that is separate and apart from that which he owes the U.S. companies such that he may bring an individual action rather than a derivative suit. *Sneed v. Webre*, 465 S.W.3d 169, 188 (Tex. 2015) (explaining that "shareholders have no individual or direct claims for injuries to the corporation" and thus where the claim is based on corporate injuries the shareholder must bring a derivative suit). An individual action may be permissible if, for instance, the shareholder can prove that the defendant owed him "a [contractual] duty that was separate and apart from the duty [the defendant] owed to the corporation." *French v. Fisher*, No. 1:17-CV-248-DAE, 2018 WL 8576652, at \*6 (W.D. Tex. Aug. 27, 2018) (quoting *In re Chiron Equities, LLC*, 552 B.R. 674, 694 (Bankr. S.D. Tex. 2016)). Suits for corporate mismanagement, misappropriation of corporate assets, or loss of stock value must be brought by the corporation or derivatively. *See, e.g.*, *F.D.I.C. v. Howse*, 802 F. Supp. 1554, 1562 (S.D. Tex. 1992); *Faour v. Faour*, 789 S.W.2d 620, 622 (Tex. App. 1990); *Eye Site, Inc. v. Blackburn*, 796 S.W.2d 160, 161 (Tex. 1990). Here, Ye has not presented a contract that imposes special duties on Zhang in favor of Ye or that he is otherwise owed a direct duty as an individual.

The Court accordingly **GRANTS** Zhang's motion as to Ye's individual breach of fiduciary duty claims, and proceeds to consider Ye's derivative claims.[5]

---

[5]The Court notes that Ye did not address his derivative claims in post-trial briefing. The Court, however, presumes that Ye would raise similar arguments as his individual claims given his arguments in pre-trial briefing and in any event considers the evidence as a whole in evaluating Ye's derivative claims.

The Court further notes that while Ye did not file a written demand on the corporation, he was not required to because the U.S. companies are closely held corporations. While Texas law imposes a stringent requirement that a shareholder file a written demand on the corporation setting forth with particularity the conduct, regardless of whether such an act would be futile, Tex. Bus. Code § 21.553, that requirement does not apply to closely held corporations like the U.S. companies, *id.* § 21.563(b).

### 2.    Breach of fiduciary duty

The Court now turns to whether Zhang breached his fiduciary duties of loyalty and care.[6] Ye argues that he has presented sufficient evidence to establish that Zhang breached his fiduciary duties in eight ways: (1) inducing Ye to appoint Zhang's wife, Lau, as Director of Finance; (2) selling the warehouse despite Ye's revocation of his authorization; (3) failing to pay more than $3.6 million in invoices to the U.S. companies' Chinese suppliers; (4) failing to "keep competent books so as to obfuscate the authenticity of company transactions"; (5) inducing Ye to agree to the business divorce; (6) inducing Ye to fund half of DeltaFill Inc.'s purchase of the Houston Warehouse; (7) inducing Ye to agree to sell Warehouse when he had already listed the Warehouse for sale; and (8) misappropriating a venture patent for his own personal gain.[7]

The Court first provides the legal framework for the fiduciary duties of loyalty and care in Texas before applying them to each of Ye's contentions in turn.

### a.    Fiduciary Duties of Loyalty and Care

"The duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his personal interests to prevail over the interest of the corporation." *Landon v. S & H Mktg. Grp., Inc.*, 82 S.W.3d 666, 672 (Tex. App. 2002); *Gearhart Indus.*, 741 F.2d at 719. It requires "an extreme measure of candor, unselflessness, and good faith on the part of the officer or director." *Landon S & H Mktg.*, 82 S.W.3d at 672. Good faith is defined as "act[ing]w with an

---

[6] Ye does not argue that Zhang breached the duty of obedience, which requires that a director avoid committing ultra vires acts, i.e., acts beyond the scope of the powers of a corporation as defined by its character or the laws of the state of incorporation." *Gearhart Indus.*, 741 F.2d at 719. In any event, the Court concludes that no such breach occurred here.

[7] Ye also contends that Zhang breached his fiduciary duties by "routing revenue from all ecommerce sales of the venture into DeltaFill Enterprise's bank account." (Doc. No. 134-1 at 27). Ye, however, does not cite to any evidence of this transaction in his post-trial brief, nor does the Court find any evidence in the record. The Court accordingly declines to find a breach of fiduciary duty on this basis.

intent to confer benefit on the corporation." *Gearhart Indus.*, at 720 (citing *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 578 (Tex. 1963)).

A director is considered "interested" if he (1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity, (2) buys or sells assets of the corporation, (3) transacts business in his director's capacity with a second corporation of which he is also a director or significantly financially associated, or (4) transacts business in his director's capacity with a family member. *Gearhart Indus.*, 741 F.2d at 719–20 (internal citations omitted). Whether a director is interested with respect to a particular transaction is a question of fact. *Floyd v. Hefnor*, 556 F. Supp. 2d 617, 649 (S.D. Tex. 2008); *Gearhart* at 719. Once "interest" is demonstrated, the burden shifts to the interested officer or director to show that the action under consideration is fair to the corporation. *Floyd*, 556 F. Supp. 2d at 649 (citing *Gearhart Indus.*, 741 F.2d at 720).

"[T]he duty of care requires a director to be diligent and prudent in managing the corporation's affairs." *Gearhart Indus.*, 741 F.2d at 720. A director must handle his duties with such care as "an ordinarily prudent man would use under similar circumstances." *Id.* (quoting *McCollum v. Dollar*, 213 S.W. 259, 261 (Tex. App. 1919)).

The business judgment rule, however, raises the standard for liability. The Fifth Circuit has stated that, under the business judgment rule, Texas courts "will not impose liability upon a noninterested corporate director unless the challenged action is *ultra vires* or is tainted by fraud." *Id.* at 721. The business judgment rule "protects the broad discretion directors . . . must have in managing the corporation's business," and thus where business decisions are made in good faith, directors are shielded from liability for any corporate losses that might result "'however unwise or inexpedient' the decision may seem in hindsight." *In re Life Partners Holdings, Inc.*, No. DR-11-

34

C-43-AM, 2015 WL 8523103, at *7 (W.D. Tex. Nov. 9, 2015) (quoting *Ritchie*, 443 S.W.3d at 864). The business judgment rule is not merely a defense, but is a substantive rule of law that requires both pleading and proof to avoid its reach. *F.D.I.C. v. Schreiner*, 892 F. Supp. 869, 882 (W.D. Tex. 1995).

Where the business judgment rule applies, it is clear that a corporate director's simple negligence is not actionable as a breach of fiduciary duty. *In re Life Partners*, 2015 WL 8523103, at *7. It is unclear, however, whether directors are liable for gross negligence. *Compare In re Life Partners*, 2015 WL 8523103, at *7 (finding liability for gross negligence); *FDIC v. Harrington*, 844 F. Supp. 300, 306 (N.D. Tex. 1994) (same), with *Floyd v. Hefner*, 2006 WL 2844245, at *28 (S.D. Tex. Sept. 29, 2006) (reading *Gearhart* to not hold directors liable for gross negligence). The Court assumes without deciding that directors may be liable for gross negligence, because the Court does not find that Zhang's conduct in any event constitutes gross negligence. The question of director negligence is a question of fact and must be decided on a case-by-case basis. *Gearhart Indus.*, 741 F.2d at 720.

With this legal framework in mind, the Court turns to each of Ye's claims. Because Ye does not specify which duties he believes are breached as to each of his eight claims, the Court addresses only those duties that it determines merit discussion as to each claim.

### b.    Analysis

First, Ye contends that Zhang breached his fiduciary duties by "inducing Ye to agree to the appointment of his wife, Lau, as the [nominal defendant's] Director of Finance." (Doc. No. 134-1 at 26). The Court disagrees.

The question is whether Zhang acted in a self-interested manner in contravention of his duty of loyalty. Under *Gearhart Industries*, a director is considered interested if, inter alia, he

"transacts business in his director's capacity with a family member." 741 F.2d at 720. Assuming that Zhang was an interested party in nominating and appointing his wife as the companies' accountant, the burden shifts to Zhang to show that that hiring decision was fair to the corporation. *Floyd*, 556 F. Supp. 2d at 649 (citing *Gearhart*, 741 F.2d at 720). As the parties testified at trial, the U.S. companies operated without a corporate accountant until Lau was hired in 2016. Prior to that time, Lau helped to keep the nominal defendant's books in an unofficial capacity. Given the need for an accountant and Lau's prior experience and service to the corporations, the Court finds that Zhang's suggestion to appoint Lau was made in good faith and was fair to the U.S. companies. Ye has not established that Zhang's conduct with respect to appointing Lau constituted a breach of his duties.

Second, Ye contends that Zhang breached his fiduciary duties by "pressing on with the sale [of the Houston Warehouse] despite being aware of Ye's conditions for selling and his subsequent revocation of authorization to sell." (Doc. No. 134-1 at 27). Ye, however, has not demonstrated that Zhang's personal interests prevailed over those of the U.S. companies in violation of his duty of loyalty. *Landon*, 82 S.W.3d at 672. Under *Gearhart Industries*' framework for interested parties, Ye has not shown that Zhang "ma[de] a personal profit from [the sale]." *Gearhart Indus.*, 741 F.2d at 719–20. And while Zhang did "sell[] [an] asset[] of the corporation," he did so under DeltaFill, Inc.'s name and neither intended to nor did in fact personally profit from the sale. *Id.*

Indeed, Zhang's testimony at trial demonstrates that he sold the Warehouse in good faith. Zhang testified at trial that he believed that selling the Houston Warehouse was necessary due to the poor financial health of the U.S. companies—a concern and belief that he expressed in a WeChat message to Ye, Gu, and Ren in September 2018. (Doc. No. 126 at 145:19–146:4); (Doc. No. 128 at 733:8–14). Zhang was authorized to sell the Warehouse after the parties signed the

Certificate at the October Meeting. And while Zhang was aware that Ye subsequently added conditions for the sale and unilaterally signed a resolution revoking Zhang's authorization to sell, this Court has already discussed *supra* that Zhang believed Ye's unilateral resolutions to be invalid based on the parties' custom for making major business decisions. Ye has thus not shown that Zhang's decision to proceed with the sale violated their corporate practices or was bereft of "an intent to confer benefit on the corporation." *Gearhart Indus.*, at 720. Ye has thus failed to establish a breach of the duty of loyalty.

Nor has Ye established that Zhang violated his duty of care in proceeding with the Warehouse sale. Ye has not demonstrated that Zhang negligently mismanaged the corporations through the sale, nor has he otherwise produced sufficient proof of fraud or gross negligence to overcome the business judgment rule. *Gearhart Indus.*, 741 F.2d at 720 (citing *McCollum*, 213 S.W. at 261). The Court accordingly determines that Zhang did not breach his fiduciary duties.

Third, Ye contends that Zhang breached his fiduciary duties by "failing to pay more than $3.6 million in invoices to" the U.S. companies' Chinese suppliers. (Doc. No. 134-1 at 26). The Court disagrees. Where, as here, testimony at trial demonstrated that the U.S. companies were struggling financially, and there was no evidence that Zhang impermissibly transferred funds or assets out of the companies, Ye has not sufficiently established that Zhang's failure to pay the invoices was self-interested. Nor has Ye presented sufficient evidence to overcome the business judgment rule, which "protects the broad discretion directors . . . must have in managing the corporation's business." *In re Life Partners Holdings*, 2015 WL 8523103, at *7 (quoting *Ritchie*, 443 S.W.3d at 864). Such latitude applies with particular force where, as here, the companies are suffering and difficult business decisions must be made. The Court concludes that the evidence

does not support the conclusion that Zhang breached his fiduciary duties by failing to pay the outstanding invoices.

Fourth, Ye contends that Zhang breached his duties by "failing to keep competent books so as to obfuscate the authenticity of company transactions." (Doc. No. 134-1 at 26–27). The Court begins by acknowledging that the evidence adduced at trial establishes that the companies' record-keeping practices were far from exemplary. The auditor testified at trial and noted in her audit report that many records that ought to have been kept—such as proof of invoicing, payment, shipment, and unit price—were not, (Doc. No. 127 420:10–24; 421:5–23; 424:16–19), and that she accordingly was unable to confirm many transactions. The auditor also focused on the unusual number of related party transactions that were not recorded in the accounting books, and testified that the accounting practices of the companies generally did not conform to GAAP (Doc. No. 127 463:9–17).

The Court disagrees, however, that the evidence sufficiently establishes that Zhang, who was not himself the accountant, engaged in self-interested conduct or an impermissible dereliction of care. The auditor explained that demarcation as an unconfirmed transaction does not necessarily mean that the transaction was fraudulent. (Doc. No. 420:18–24; 421:12–21). Rather, it simply means that not all five documents that are required to confirm a sale for auditing purposes were found. (Doc. No. 127 523:10–25). And as to the related-party transactions, as the Court discussed *supra*, the transactions more likely reflect poor business practices than fraudulent conduct. Without more, the evidence does not sufficiently establish that Zhang purposefully obscured company records to hide fraudulent transactions or that he failed to act for the benefit of the U.S. companies in violation of his duty of loyalty. Nor does the evidence establish that Zhang breached his duty of care. The Fifth Circuit has instructed that courts ought to provide necessary latitude to those

making business decisions unless fraud, ultra vires, or gross negligence is afoot. *Gearhart Indus.*, 741 F.2d at 721. The Court has already determined that Zhang did not act fraudulently, and Zhang's management was not grossly negligent. *Burk Oryalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981) (defining gross negligence as an "entire want of care"). Zhang was not the corporate accountant, and while a director may nonetheless be responsible for others' conduct where his failure to intercede constitutes a "total abdication of duties," the evidence does not support such a total abdication here. *F.D.I.C. v. Harrington*, 844 F. Supp. 300, 306 n.7 (N.D. Tex. 1994). The Court thus concludes that the evidence insufficiently establishes a breach of fiduciary duties on these grounds.

Fifth, Ye contends that Zhang breached his duties by "inducing Ye to sign fraudulent English-language agreements to execute a 'business divorce' wholly in Zhang's favor." (Doc. No. 134-1 at 27). The central question is whether the evidence sufficiently demonstrates that Zhang acted in a self-interested manner at the expense of the U.S. companies. The Court concludes that it does not. At best, the evidence shows that the total assets of DeltaFill Enterprise and DeltaFill Express—the two companies that Zhang proposed to take over—increased significantly in the two years leading up to the October Meeting while the total assets of the remaining companies, which Ye was to acquire, decreased. (Doc. No. 127 451:14–452:5; 453:4–19). However, while this asset shift may appear, ostensibly, convenient for Zhang, as the Court discussed at length *supra*, the evidence does not provide a complete understanding of the corresponding liabilities nor the future performance of the companies. The evidence accordingly does not establish by a preponderance that Zhang either intended to receive or in fact receive a personal benefit in reallocating assets among the companies prior to the October Resolutions at the expense of the interests of the U.S. companies.

Moreover, to the extent Plaintiff argued at trial that Zhang failed to act with candor by not disclosing that DeltaFill Express was profitable, as the Court has discussed, the evidence does not sufficiently establish that DeltaFill Express was in fact profitable or that Zhang knew it to be so but chose to remain silent. Directors must act in good faith and not allow their personal interests to prevail over the interests of the corporation. *In re Life Partners Holdings, Inc.*, 2015 WL 8523103, at *7 (quoting *Ritchie*, 443 S.W.3d at 864). The evidence does not sufficiently establish that Zhang failed to do so here. Accordingly, the Court concludes that Zhang did not breach his fiduciary duties by persuading Ye to sign the October Resolutions.

Ye's remaining claims for breach of fiduciary duty fail because they do not meet the third requirement for a breach of fiduciary duty claim. Namely, that Zhang personally benefited or that the nominal defendants, to whom Zhang owed fiduciary duties, were harmed.

As to Ye's sixth claim, the Court disagrees with the factual premise of Ye claim that Zhang breached his duties by transferring OnePurify's inventory of water filters to DeltaFill Enterprises "without any recorded payment." As this Court has discussed *supra*, the auditor testified at trial that corporate records reflect that DeltaFill Enterprises paid $1.2 million for the inventory in cash and accounts payable. Given this evidence, and absent any showing that the transaction harmed the U.S. companies, the Court determines that no fiduciary duties were violated.

As to Ye's seventh claim, Ye argues that Zhang breached his duties by misappropriating a "venture patent" for a water filter design for his own personal gain. This Court has previously established, however, that the patent at issue is not owned by any of the Nominal Defendants.[8] (Minute Entry 11/4/2019). The technology was originally patented in China, where it is owned by

---

[8] Ye revives an argument that this Court has previously addressed. In his complaint, Ye asserted claims for breach of fiduciary duty, conversion, and theft relating to Zhang's alleged misappropriation of the patent for water filter designs. *See* (Doc. No. 76). The Court dismissed those claims for lack of standing because Ye neither owns the patents nor is assigned rights to the patents. (Minute Entry 11/4/2019). The Court nonetheless briefly addresses the argument here.

Yitachi, and was subsequently patented in the United States under Zhang's name. In prior filings, Ye argued that Zhang misappropriated the patent by obtaining the U.S. patent under his name, rather than Yitachi's, as they had agreed. *See* (Doc. No. 76). Yet, there can be no misappropriation of corporate assets where that asset, here the patent, does not, and was never intended to, belong to the Nominal Defendants, the only entities to whom Zhang owes fiduciary duties. The Court determines that those duties were not violated here.

Finally, Ye's contentions related to the Houston Warehouse similarly fail to demonstrate either harm to the U.S. companies or personal gain to Zhang. Listing the Warehouse on the market, even if prior to obtaining shareholder authorization, creates no obligation to any party and accordingly did not harm the U.S. companies. And while Ye claims that he was injured by funding half of the purchase of the Warehouse, Zhang did not owe a duty to Ye individually and no harm befell the U.S. companies from the purchase of the Warehouse. The Court accordingly rejects these bases for a breach of fiduciary duty.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Judgment on Partial Findings.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 15th of May, 2020.

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE